## Swenk v. Asbury

392

C.P. of Berks County, no. 03-3769.

*James M. Potter,* for petitioners.
*Jeffrey Lewis* and *Jeffrey B. Albert,* for intervenors.

LASH, *J.,* June 19, 2003—The matter before this court is a dispute over entitlement to legal fees between intervenors, Mark A. Verlin, Esquire, and Verlin Law Offices, the former counsel of petitioners, Ralph W. Swenk Jr., a

minor, by Wanda D. Hall and Ralph W. Swenk Sr., his parents and natural guardians, and Wanda D. Hall and Ralph W. Swenk Sr., in their own right and petitioners' current counsel, James M. Potter, Esquire, and Liever, Hyman and Potter P.C. The fees at issue, totaling $28,750, accrued as a result of settlement of the personal injury claims of Ralph W. Swenk Jr. (Billy Swenk). The gross settlement of $115,000 includes payment by respondent, State Auto Insurance Companies, of its limits of liability insurance coverage of $50,000, payment by State Auto Insurance Companies of its limits of uninsured motorist coverage of $50,000 and payment by State Farm Fire & Casualty Insurance Company of its limits of secondary liability insurance coverage available to respondent, Daniel Asbury, in the amount of $15,000. The fees, which represent 25 percent of the gross settlement figure, were approved by this court on May 27, 2003, pursuant to a minor's compromise petition. The court then ordered the legal fees to be placed in escrow pending disposition of this matter.

Intervenors assumed representation of petitioners pursuant to a contingency fee agreement executed by Billy Swenk's mother, petitioner, Wanda D. Hall, dated June 13, 2002.[1] Although subsequently discharged by petitioners prior to consummation of the settlement, intervenors claim entitlement under a theory of quantum meruit, arguing that the engineering of the settlement, and all work performed to create the ability to obtain the settlement, was performed by them and not by Attorney

---

1. Although dated June 13, 2002, it appears, from other evidence, that the agreement was executed sometime after July 3, 2002.

Potter. They also urge that quantum meruit is not limited to fees accrued on an hourly basis, but may also include contingency fees, under these facts and circumstances.

Attorney Potter denies that intervenors are entitled to any portion of the fees. He claims that not only were intervenors discharged by petitioners, but that intervenors should never have assumed representation in the first place, due to a conflict of interest, and other ethical considerations. For reasons set forth herein, this court rules that intervenors are not entitled to any portion of the attorney's fees.

On April 2, 2002, minor petitioner, Billy Swenk, along with Amanda Bryan, were passengers in an automobile owned by David H. and Peggy Bryan, and operated by Daniel Asbury, when they were involved in a collision with a tractor-trailer. The accident occurred on Route 61 in Port Clinton, Schuylkill County, Pennsylvania. After the accident, the tractor-trailer left the scene. The identity of the owner and/or operator of the tractor-trailer has not been ascertained.

By all accounts, each of the three individuals in the Bryans' vehicle suffered serious injuries.[2] At the time of the accident, Billy Swenk was 16 years old.[3]

Both Daniel Asbury and Amanda Bryan subsequently retained intervenors to handle their personal injury claims. At the time intervenor, Mark A. Verlin, Esquire, met with Daniel Asbury and Amanda Bryan, he handed

---

2. Intervenor, Mark A. Verlin, Esquire, testified that his assessment was that each of the three had a personal injury claim worth "at least six figures."

3. Billy Swenk's date of birth was November 12, 1985.

them business cards to give to petitioner, Billy Swenk, and asked them to have Billy call him.

What happened next is in dispute. According to Billy Swenk, he never contacted intervenors and was surprised when intervenor, Mark A. Verlin, Esquire, appeared at Billy's grandmother's house where Billy was residing. According to Attorney Verlin, he made this contact only after Billy telephoned him and requested the contact.

In any event, neither parent was present when Attorney Verlin met with Billy. Attorney Verlin distributed a blank contingency fee agreement and medical authorization forms to Billy to give to his mother. Although Attorney Verlin never met personally with either parent,[4] he did have phone contact with Billy's mother, Wanda D. Hall, who agreed to sign the paperwork and return it to intervenors.[5] Wanda D. Hall did forward the documentation to the intervenors, who then assumed representation of Billy Swenk, as well as the other two claimants.

Intervenors then began processing the claims. They obtained medical reports. They investigated the accident in an attempt to identify the tractor-trailer, but were unsuccessful. Subsequently, on November 27, 2002, invervenor, Mark A. Verlin, Esquire, sent correspondence

---

4. At no time did Attorney Verlin, nor anyone from his office, have any contact with Billy's father, Ralph W. Swenk Sr.

5. Although Wanda D. Hall was not the primary custodian of Billy, she did have authority to act on his behalf, pursuant to a custody order entered by the Honorable Jeffrey K. Sprecher in Berks County Court to no. 98-9589. The custody order provides that both parents shall share legal custody. That order was apparently entered November 13, 1998 and remains in effect.

to the Bryans' auto carrier, State Auto Insurance Companies, demanding the uninsured motorist policy limits of $200,000. This demand was on behalf of all three claimants.[6]

At some point prior to the demand letter being sent, Billy Swenk and his mother, as a result of a discussion with intervenor, Mark A. Verlin, Esquire, became apprehensive that Billy may be shortchanged on his financial recovery.[7] As a result, they met with Attorney Potter and subsequently retained him to represent their interests.[8] After Attorney Potter was retained, he sent correspondence by ordinary mail to intervenor, Mark A. Verlin, Esquire, dated October 8, 2002, advising intervenor Verlin that Attorney Potter was retained to represent Billy Swenk. Attorney Potter also raised his concern that Attorney Verlin may be operating under a conflict of interest because he represented all three parties. Intervenors denied receiving this correspondence from Attorney Potter and continued to proceed with representation of all three parties. Attorney Potter then sent a second correspondence, this time by certified mail, dated December 13, 2002, reiterating his representation of petitioners, and

---

6. State Auto eventually agreed to tender the limits and so notified intervenors sometime in January 2003.

7. Billy Swenk testified that his concern stemmed from the fact that he would have to share the $200,000 pot with the two other claimants, and that he was advised that his injuries were not as serious as the other two. Attorney Verlin testified that he believed the concern arose after petitioners were advised of the potential for a limited tort issue, which issue was eventually resolved when the seriousness of Billy's injuries was determined through review of the medical reports.

8. The petitioners first met with Attorney John A. Hoffert Jr., who referred the matter to Attorney Potter.

enclosing another copy of the October 8, 2002 letter. Attorney Potter also set forth, in furtherance of his belief that Attorney Verlin's representation of all three claimants was a conflict of interest, that Billy Swenk had given a statement to a representative of State Auto Insurance Companies, setting forth that Mr. Asbury was driving his vehicle in excess of 80 miles per hour at the time of the accident.

In his testimony, intervenor, Mark A. Verlin, Esquire, acknowledged receipt of the December 13, 2002 letter, and conceded that he was discharged by petitioners at that point in time. Nevertheless, additional correspondence was issued by intervenors on behalf of petitioners. The first, dated January 15, 2003, and sent by Attorney Jerome Verlin to State Auto Insurance Companies, confirmed the insurance company's decision to offer the policy limits of $200,000 on the uninsured motorist claim. A second correspondence from Attorney Mark A. Verlin, dated January 16, 2003, and addressed to all three claimants, reported State Auto's decision to offer the policy limits. Further, in this correspondence, Attorney Verlin states the following:

"The next step would be to fairly split the money among the three of you. An argument could be made that the split should be equal and that all three of you have had surgery, need future surgery, have permanent scarring, and unpaid medical expenses. However, this could only be done if all three of you would agree to such an even division. If anyone of you objects, I then plan to follow the procedure set forth in my November 27, 2002 letter to have a hearing with a retired judge to independently evaluate your cases to make sure the split is as

fair as possible. This is essentially the same procedure that would occur if all three of you were represented by different counsel and we needed to determine how to properly split the $200,000."

Attorney Verlin then closes by acknowledging Attorney Potter's representation regarding other "avenues of recovery."

On February 20, 2003, Attorney Michael Saltzburg, representing State Auto Insurance Companies, sent correspondence to intervenors and Attorney Potter, which stated, among other things, that the $200,000 could only be allocated in one manner: $100,000 to the claim of Amanda Bryan, $50,000 to the claim of Daniel Asbury, and $50,000 to the claim of Billy Swenk. This allocation was based upon a recovery of the policy limits of $50,000 for each claimant, with Amanda Bryan getting an additional $50,000 because she was the only claimant who was also an insured under the Bryans' policy and could, therefore, receive stacked coverage, resulting from the Bryans' coverage of two automobiles. This disclosure by Attorney Saltzburg was the first time either counsel knew of the restrictions on allocation of the settlement proceeds.

On behalf of petitioners, Attorney Potter then obtained a settlement with State Auto Insurance for the limits of the liability coverage of $50,000, and from State Auto Insurance on the limits of the secondary liability insurance coverage of Daniel Asbury in the amount of $15,000. All three settlements were approved by this court pursuant to an order dated May 27, 2003.

The first matter to determine is whether intervenors committed ethical violations, and if so, what effect those

violations have on recovery of the legal fees. Attorney Potter alleges that intervenors substantially breached the Lawyers' Rules of Professional Conduct, first by soliciting petitioners to obtain the right to represent them, secondly, by representing all three claimants despite a conflict of interest, and finally, by continuing with representation of petitioners, even after being discharged.

Although intervenors may well have committed violations in all three areas, we will focus our inquiry on the most serious charge, conflict of interest.[9]

Rule 1.7 of the Rules of Professional Conduct deals with the general rules for a conflict of interest, stating:

"(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

"(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

"(2) each client consents after consultation.

---

9. Regarding the solicitation issue, this court accepts the testimony of Billy Swenk as credible over that of Attorney Verlin. It is unlikely that an attorney would arrange for a meeting with a minor claimant without first discussing the matter with one of the parents, or at least securing the presence of one of them. His appearance at Billy Swenk's grandmother's house to speak with Billy was certainly out of order. On the representation of the discharge issue, even assuming that you accept intervenors' assertion that they never received Attorney Potter's correspondence of October 8, 2002, there is sufficient evidence through intervenors' own correspondence of January 15, 2003 and January 16, 2003, as well as the admission in the testimony of intervenor, Mark A. Verlin, Esquire, that intervenors continued to act on behalf of petitioners, even after being discharged.

"(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

"(1) the lawyer reasonably believes the representation will not be adversely affected; and

"(2) the client consents after full disclosure and consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved."

There are two potential conflicts here. First, there is the issue of liability involving a conflict between Daniel Asbury, the operator of the vehicle, and petitioner, Billy Swenk. Secondly, there is an issue on damages, as all three claimants, each with substantial injuries, were faced with the prospect of sharing proceeds of $200,000.

Regarding the liability issue, intervenor, Mark A. Verlin, Esquire, testified that he did not recognize any conflict between Daniel Asbury and Billy Swenk. He urged that all three consistently stated that Daniel Asbury had no fault in the accident. His analysis of the case was that the tractor-trailer operator was solely at fault and that Daniel Asbury could not be held liable for contributory negligence. He maintained this position even when confronted on cross-examination with the Pottsville Hospital Emergency Department report, compiled on the day of the accident, which stated that Billy Swenk advised a health care provider that "the [Bryan] vehicle was moving at approximately 80 miles per hour at the time of the accident and the vehicle struck a truck." In-

tervenor Verlin's testimony is disingenuous. For him, an attorney with 20 years of experience, with the last 10 years being devoted almost exclusively to personal injury actions, to claim that it never crossed his mind that an 18-year-old operator of a motor vehicle,[10] with two other teenagers in the vehicle, could not be found by a fact-finder to have at least a small percentage of culpability, is not believable. Setting this aside, his review of the emergency report, which disclosed that one of his clients was reporting that another client operated the vehicle at 80 miles an hour, should certainly have given him pause.

In fact, petitioners had a colorable claim against Daniel Asbury. This is demonstrated by the settlement Attorney Potter was able to obtain on liability coverage on the Bryan auto and the secondary liability coverage on Daniel Asbury. Depending on the extent of Billy Swenk's injuries, petitioners could have obtained a judgment against Daniel Asbury beyond the limits of insurance coverage. There is no question that an actual conflict of interest existed.

Regarding the damages issue, it is conceded that, with the benefit of hindsight, there was no actual conflict on the apportionment of the $200,000 fund. Intervenors, however, did not know this until so notified by Attorney Saltzburg, well after Attorney Potter had already assumed representation of petitioners. Attorney Verlin's proposed resolution, if there was a dispute, as set forth in his correspondence of January 16, 2003, and his previous correspondence of November 27, 2002, was inappropriate.

---

10. Daniel Asbury's date of birth was March 5, 1984.

To send the matter to a retired judge who would divide the proceeds, without providing any of the three claimants the opportunity to advocate his position, demonstrates the difficulty when one attorney attempts to represent parties with competing interests.

Rule 1.7 permits an attorney to represent two clients with adverse interests when the lawyer reasonably believes the representation will not adversely affect either client's rights, and each client consents after consultation. If intervenors had the belief that their dual representation would have no effect on the potential claims of their clients, this belief was certainly not reasonable. Further, there was no evidence that any client was consulted on the conflict of interest or consented to continued representation after consultation. In fact, as already stated, Attorney Verlin refused to recognize the conflict and, therefore, could not have consulted his clients in an appropriate manner.

The actions taken by intervenors in representing petitioners after already agreeing to represent Daniel Asbury and Amanda Bryan constituted a conflict of interest and was inappropriate.

We turn then to the question of the effect the presence of the conflict of interest has on the outcome of the issue at bar. Intervenors argue that even assuming a violation of the Rules of Professional Conduct, said violations are not actionable against them. They point to language in the preamble to the Rules of Professional Conduct which states:

"Violation of a rule should not give rise to a cause of action nor should it create any presumption that a legal

duty has been breached. The rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability. Furthermore, the purpose of the rules can be subverted when they are invoked by opposing parties as procedural weapons. The fact that a rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the rule. Accordingly, nothing in the rules should be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such a duty."

They also argue that no harm came to petitioners as a result of their representation. They point out that they provided all the legal work and advice necessary to maximize petitioners' recovery. If they had continued in their representation of petitioners, petitioners would have enjoyed the same result. They even go so far as to suggest that they would have also obtained the settlement on the policy limits of liability coverage and secondary coverage, which Attorney Potter was able to obtain by making a claim against the culpability of Daniel Asbury.[11]

The Supreme Court case of *Maritrans GP Inc. v. Pepper, Hamilton & Scheetz,* 529 Pa. 241, 602 A.2d 1277 (1992), is instructive. That case involved a conflict between a former client and a current client of defendant

---

11. They also make a claim for the fees generated from these settlements. Considering their position on the conflict of interest issue, their insistence on attorney's fees here is audacious.

law firm, as both were business competitors. In holding that the courts have the power to enjoin an attorney from breaching his duty to avoid representing conflicting interests, the Supreme Court noted that an activity is actionable if it constitutes breach of a duty imposed by a statute or by common law. At common law, an attorney owes a fiduciary duty to his client. Such duty demands undivided loyalty and prohibits the attorney from engaging in a conflict of interest. It then follows that a breach of such a duty is actionable. The Supreme Court reversed the Superior Court, and upheld the trial court's decision to enter a preliminary injunction, prohibiting the defendant law firm from continuing to act as counsel for several competitors of another client.

We believe that the holding in *Maritrans* applies here. As already stated, intervenors' theory for recovery of attorney's fees is based on quantum meruit. As noted in intervenors' brief, quantum meruit is an equitable remedy. *Feingold v. Pucello,* 439 Pa. Super. 509, 654 A.2d 1093 (1995). As such, a determination should be based on principles of fairness.

In the determination of a fair and just result, the courts may look to the conduct of the proponent to determine an appropriate remedy. The doctrine of "unclean hands" [12] is a defense in equity when a court finds a party seeking affirmative relief to be guilty of fraud, unconscionable conduct or bad faith directly related to the matter at issue, which injures the other party and affects the bounds of equities between litigants. *Equibank v. Adle*

---

12. He who comes into equity must come with clean hands.

*Inc.,* 407 Pa. Super. 553, 595 A.2d 1284 (1991). Transgressors should not be allowed to profit from their own wrongdoing.

By assuming representation of all three claimants, intervenors breached their duty to their clients. The accrual of attorney's fees comes directly from the improper representation. This type of ethical violation was actionable under the *Maritrans* matter and is actionable here.

The fact that petitioners, nor the other claimants, did not suffer any harm and that intervenors performed the work necessary to achieve the recoveries does not change this result. The Supreme Court in *Maritrans* cites the United States Supreme Court, stating:

"A fiduciary . . . may not perfect his claim to compensation by insisting that although he had conflicting interests, he served his several masters equally well or that his primary loyalty was not weakened by the pull of his secondary one. Only strict adherence to these equitable principles can keep the standard of conduct for fiduciaries 'at a level higher than that trodden by the crowd.' " 529 Pa. at 258, 602 A.2d at 1285-86, citing *Woods v. City National Bank & Trust Company,* 312 U.S. 262, 269, 61 S.Ct. 493, 497, 85 L.Ed. 820 (1941) (quoting Justice Cardozo).

In its analysis, the *Maritrans'* court cited with approval decisions of courts of other jurisdictions who ordered the disgorgement of fees paid or the forfeiture of fees owed to attorneys who have breached their fiduciary duties to their clients by engaging in impermissible conflicts of interest. (*Maritrans, supra,* 529 Pa. at 258, 602 A.2d at 1285.)

Intervenors had no business assuming the representation of petitioners. Any work performed on petitioners' behalf.or any fees or recovery generated by intervenors stemmed solely from the wrongful representation. Intervenors should not now be rewarded for their wrongful activity. Accordingly, this court orders that based on the violation of the conflict of interest, intervenors are not entitled to any portion of the legal fees. All legal fees shall be distributed to Attorney Potter and his firm.[13]

Wherefore, we enter the following order:

## ORDER

And now, June 19, 2003, upon consideration of the petition of intervenors, Verlin Law Offices and Mark A. Verlin, Esquire, regarding payment of legal fees, briefs of the parties, and after hearing held, the court orders that the entire escrowed fund of $28,750 shall be distributed to James M. Potter, Esquire, and/or the Law Firm of Liever, Hyman and Potter P.C., forthwith. The claim of intervenors to said fund is denied.

---

13. As a result of this holding, we do not decide the question on whether a successful claim for quantum meruit can result in the recovery of attorney's fees based on a contingent fee.