U.S. COMMODITY FUTURES TRADING COMMISSION, Plaintiff,

v.

WECORP, INC., a Hawaii company; Stuart W. Jones, an individual; and Payton Lowe, an individual, Defendants, Gary V. Dubin, an individual; Gary Duck, an individual; and Nathan P. Ramos, an individual, Relief Defendants.

No. 2:09–CV–00153–PMP.

United States District Court, D. Hawai'i.

March 23, 2012.

Derrick K. Watson, Office of the United States Attorney, Honolulu, HI, Jeff Le Riche, Jennifer J. Chapin, Jo Mettenburg, U.S. Commodity Futures Trading Commission, Kansas City, MO, for Plaintiff.

Stuart W. Jones, Vista, CA, pro se.

Payton Lowe, Hilo, HI, pro se.

Frederick J. Arensmeyer, Dubin Law Offices, Honolulu, HI, for Defendant.

Gary Duck, Vista, CA, pro se.

Nathan P. Ramos, Keeau, Hilo, HI, pro se.

## ORDER

PHILIP M. PRO,[1] District Judge.

Presently before the Court is Plaintiff Commodity Futures Trading Commission's Motion for Summary Judgment (Doc. #248), filed on July 18, 2011. Relief Defendant Gary Dubin filed an Opposition and Countermotion for Summary Judgment (Doc. #261) on September 19, 2011. Plaintiff filed a Reply (Doc. #271) on October 13, 2011. Plaintiff filed an Opposition (Doc. #276) to Relief Defendant Gary Dubin's Countermotion on January 23, 2012. Relief Defendant Gary Dubin filed a Reply (Doc. #278) on February 6, 2012. The Court held a hearing on these motions on March 9, 2012. (Mins. of Proceedings (Doc. #279).)

## I. BACKGROUND

Relief Defendant Gary Dubin ("Dubin") is a practicing attorney in the Dubin Law Offices ("DLO") in Honolulu, Hawaii. (Pl.'s Mot. Summ. J. (Doc. #248) ["MSJ"], Ex. A at 5.) Dubin owns Dubin Financial ("DF"), a limited liability company in the investment business also located in Honolulu, Hawaii. (Id. at 5–6.) In October or November of 2008, Defendant Stuart Jones ("Jones") of Defendant WeCorp, Inc. ("WeCorp") contacted Dubin for legal assistance. (Id. at 8–9.) Jones stated that WeCorp was involved in foreign currency trading ("forex") through an automated trading program. (Id. at 9–11.) Jones wanted Dubin's assistance in ensuring

WeCorp was operating in compliance with any applicable laws, particularly federal securities laws. (Mem. in Opp'n to Mot. Summ. J. (Doc. #262) ["Opp'n"], Dubin Decl. at 2.)

In a November 5, 2008 email, Dubin outlined the services DLO would perform for WeCorp. (MSJ, Ex. A at 15–20.) DLO was to perform a legal audit, draft new transactional documents, arrange for accounting and banking controls, rehabilitate organizational structures, and assist in obtaining a securities license. (Id.) In exchange, DLO would receive a $70,000 retainer. (Id. at 21, Ex. B, Attach. B–2.) According to Dubin, the retainer paid to DLO was to be a flat fee. (MSJ, Ex. A at 81; Opp'n, Dubin Decl. at 2–3.) In addition to Dubin's services, DLO planned to employ three consultants to perform the evaluation of WeCorp's operations: Marjorie Bush ("Bush"), an accountant; William Sarsfield ("Sarsfield"), a banking and business consultant; and Travis Branch ("Branch"), a securities licensee. (MSJ, Ex. A at 25, 32–34, 62.) As early as the November 5 email, Dubin mentioned to Jones a potential merger between WeCorp and DF. (MSJ, Ex. A, Attach. A–1.)

WeCorp ultimately hired and paid Bush directly as its accountant, but Dubin "depended on her too to give the information as to what was going on on the inside" at WeCorp. (MSJ, Ex. A at 25–26.) Specifically, Dubin tasked Bush with determining whether WeCorp's promise of a one hundred percent return on any investment with its forex trading program could "possibly be real." (MSJ, Ex. B, Attach. B–1.) Second, Bush was to organize WeCorp on the tax front. (Id.)

As to Sarsfield, DLO was going to pay him for his services upon receiving the

---

1. The Honorable Philip M. Pro, United States District Judge for the District of Nevada, sitting by designation.

funds from WeCorp. (MSJ, Ex. A at 34.) WeCorp paid DLO $15,000 for Sarsfield's services, but DLO never paid Sarsfield because Sarsfield decided he did not want to become involved. (*Id.* at 35.) Sarsfield warned Dubin not to get involved with WeCorp. (*Id.*) DLO did not return the money WeCorp forwarded to DLO for Sarsfield's services because, according to Dubin, Jones told him to apply it to the work DLO was performing for WeCorp. (*Id.*) As for Branch, he was going to review what licenses WeCorp needed to conduct its business, but Branch later decided he did not want to be involved either. (*Id.* at 62–63.)

In mid-November 2008, WeCorp wired into DLO's client trust account two payments in the amount of $45,000 and $40,000. (*Id.* at 22.) That same day, Dubin moved the entirety of the retainer money out of the DLO client trust account. (*Id.* at 22–23.)

On November 14, 2008, Dubin, Bush, and Branch went to Hilo to meet Jones and other WeCorp personnel, including Defendant Payton Lowe ("Lowe") and Relief Defendant Gary Duck ("Duck"). (MSJ, Ex. B at 27–30, Attach. B–1.) At the meeting, WeCorp personnel introduced themselves and gave a presentation on WeCorp's forex activities. (*Id.* at 29.)

Dubin was concerned WeCorp was a scam, and he advised Jones to shut down WeCorp's website and to return investors' funds. (*Id.* at 26–27, 53.) If WeCorp's forex automated trading system was legitimate, Jones then could restructure WeCorp to operate lawfully. (*Id.*) According to Dubin, Jones advised him that Jones had shut down the website and returned the funds to all investors except for a few of Duck's friends. (*Id.* at 27.) One of DLO's employees verified that the WeCorp website had been shut down, and Dubin thus believed WeCorp was taking his advice. (Opp'n, Dubin Decl. at 8.)

In December 2008 or January 2009, DLO gave Jones several alternatives to make WeCorp's business lawful, including getting a license, working for one individual investor, or combining with DF and DF would obtain a securities license. (*Id.* at 8–9; MSJ, Ex. A at 39, 45–46.) Dubin also suggested the possibility of licensing the automated trading program for royalties. (MSJ, Ex. A at 54.)

In mid-December 2008, Dubin advised Jones that a Japanese investor, Mr. Nakamura, was in town and was interested in investing funds with WeCorp. (*Id.* at 56, 60–61.) However, Nakamura did not come into town and Dubin was using Nakamura as "bait" and a "carrot" to get Jones to provide Dubin with more information on WeCorp's activities. (*Id.* at 60–61.) On January 2, 2009, Dubin sent Jones an email in which he stated that he had "signed up" Nakamura, but in fact Nakamura had not agreed to invest with WeCorp, and the statement was "only for Jones's consumption." (*Id.* at 65–66.) In the meantime, Dubin asked Bush to confirm WeCorp's profits were legitimate, and, according to Dubin, Bush confirmed they were. (*Id.* at 27–29.)

In early February 2009, Dubin drafted a proposed joint venture agreement ("JVA") between DF and WeCorp. (*Id.*, Attach. A–4.) Under the proposed JVA, DF would provide funds to WeCorp to participate in the forex trading. (*Id.*) DF and WeCorp would split the profits generated through use of the WeCorp trading program. (*Id.*) DF had the right to cancel the JVA at any time with twenty days notice, however the contract did not provide WeCorp with a similar cancellation right. (*Id.*) At his deposition, Dubin testified that he told Jones to get advice from Jones's own attorney in relation to the JVA, but Dubin could not recall if that communication was in writing. (MSJ, Ex. A at 74–75.) There is no evi-

dence in the record any such recommendation was made in writing. Dubin contends the JVA never went into effect because neither Lowe nor WeCorp employee Noah Luis ("Luis"), the two WeCorp forex traders, signed the agreement. (*Id.* at 68–70, Attach. A–4.)

Around this same time, Dubin placed $200,000 of his own funds with WeCorp. (*Id.* at 67–68.) Dubin told Jones the money was from Korean investors, but there never were any Korean investors. (*Id.* at 68, 106.) The trading of Dubin's funds did not go well. (Opp'n, Dubin Decl. at 12.) As documented in email exchanges throughout February and March 2009, Dubin ordered WeCorp to halt trading on his account and to return his funds. (*See generally* materials submitted for *in camera* review during the attorney-client privilege dispute ("AC Privilege Docs"), emails in February and March 2009.) For example, on March 17, 2009, Dubin sent an email to Lowe which purported to be from the Korean investors as a "ploy" to "scare" WeCorp into returning the $200,000. (MSJ, Ex. A at 107–08, Attach. A–5.)

On March 30, 2009, Jones sent Dubin an email inquiring how Dubin was going to return to WeCorp the retainer Dubin "held without any service rendered." (MSJ, Ex. B, Attach. B–2.) DLO never sent WeCorp an invoice but Dubin testified he would tell Jones how much time DLO spent on WeCorp work. (MSJ, Ex. A at 88–89.) Dubin never drafted any contracts on WeCorp's behalf. (*Id.* at 100–01.) Dubin did not create any structural agreements for WeCorp except for the JVA. (*Id.* at 101–02.) Dubin did not create any licensing agreements. (*Id.* at 102.) Nor did he obtain a securities license for WeCorp. (*Id.* at 102–03.) According to Dubin, Jones never asked for a return of any portion of the retainer until Dubin requested Jones return the $200,000 Dubin had invested with WeCorp. (*Id.* at 88–89.)

In a March 30, 2009 email, Dubin canceled the JVA. (MSJ, Ex. A at 88, Ex. B, Attach. B–2.) WeCorp never returned any of Dubin's $200,000.

In April 2009, Plaintiff Commodity Futures Trading Commission ("CFTC") brought the present Complaint against WeCorp, Jones, and Lowe as Defendants, alleging Defendants operated a Ponzi scheme and violated the Commodity Exchange Act ("CEA"). (Compl. (Doc.# 1).) CFTC also named several individuals, including Dubin, as "relief defendants." (*Id.*) CFTC does not allege Dubin or the other Relief Defendants violated the Act. Rather, it alleges Dubin received a retainer from WeCorp, that retainer was from WeCorp's ill-gotten gains, and Dubin has no legitimate claim to the funds. The CFTC therefore seeks to require Dubin to return the funds so that they may be distributed pro rata to victims of WeCorp's fraudulent scheme.

From the inception of this litigation, Dubin has contended this Court lacks jurisdiction over him as a Relief Defendant. On numerous occasions this Court has denied Dubin's motions to dismiss for lack of jurisdiction. Early on in the case, the Court denied Dubin's motion to dismiss, concluding that the Complaint made sufficient allegations that Dubin received ill-gotten gains from WeCorp and that Dubin did not perform legal services in return. (Order (Doc. # 57).) The Court noted that under the facts as alleged, Dubin was "akin to the paradigmatic nominal defendant as a third party holding funds in trust for the primary defendant." (*Id.* at 6–7 n. 1.) The Court cited to Hawaii Professional Rule of Conduct 1.15(d), which requires a lawyer to place a client's retainer in trust until earned. (*Id.*)

Dubin subsequently moved for summary judgment, arguing that he was hired on a flat fee basis to perform an independent

legal audit of WeCorp and he performed substantial work for WeCorp. Dubin contended he had a legitimate claim to the funds, and the Court therefore could not exercise jurisdiction over him as a nominal or relief defendant. The Court again denied Dubin's motion, this time concluding that, viewing the facts in the light most favorable to CFTC as the non-moving party, genuine issues of material fact remained as to whether the funds were a retainer as opposed to a flat fee, whether Dubin performed work for his own benefit to decide whether to invest with WeCorp rather than on WeCorp's behalf, and whether any work Dubin performed for WeCorp entitled Dubin to the entire disputed amount. (Order (Doc. # 140) at 7–8.)

Dubin again moved for summary judgment on the jurisdictional question during a protracted dispute between Dubin and the CFTC regarding whether the attorney-client privilege applied to certain emails and other documents in Dubin's possession which the CFTC sought in discovery. Dubin argued that because the Magistrate Judge in this case identified over forty separate emails that contained attorney-client privileged material, no genuine issue of material fact remained that Dubin performed work for WeCorp and thus had a legitimate claim to the retainer funds. This Court summarily denied Dubin's motion, stating that the Court previously had rejected Dubin's argument and reconsideration was not warranted. (Order (Doc. # 240) at 3.)

The parties now cross-move for summary judgment. CFTC argues no genuine issue of material fact remains that Dubin is not entitled to the $85,000 retainer because he did not perform any services for WeCorp; rather, he was acting on his own behalf to merge DF with WeCorp. CFTC also argues Dubin cannot keep the retainer because he was in a conflicted position

and he has no right to fees earned while operating under a conflict. Finally, CFTC argues Dubin is not entitled to the retainer because any work he performed for WeCorp did nothing but extend the Ponzi scheme, and thus Dubin did not provide reasonably equivalent value in exchange for the $85,000.

Dubin opposes CFTC's motion and countermoves for summary judgment. Dubin argues he has demonstrated he has a legitimate ownership claim to the funds and the Court therefore lacks jurisdiction over him as a relief defendant. Dubin argues this Court has recognized over forty emails qualifying as attorney-client communications, and thus no genuine issue of material fact remains that Dubin performed legal services on WeCorp's behalf. Dubin contends his alleged conflict of interest does not divest him of a legitimate ownership interest in the funds because WeCorp consented to Dubin's continued representation. Dubin also contends that the cases upon which CFTC relies are cases in which attorneys requested an award of attorney's fees, and do not involve the situation here where the client has paid an attorney a retainer in exchange for services rendered. As to the purported lack of reasonably equivalent value, Dubin argues the cases CFTC relies upon do not apply, as they do not involve relief defendants.

## II. LEGAL STANDARD

Summary judgment is appropriate if the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(a), (c). A fact is "material" if it might affect the outcome of a suit, as determined by the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "genuine" if sufficient evidence exists such that a reasonable fact finder could find for the non-moving party. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002). Initially, the moving party bears the burden of proving there is no genuine issue of material fact. *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002). After the moving party meets its burden, the burden shifts to the non-moving party to produce evidence that a genuine issue of material fact remains for trial. *Id.* The Court views all evidence in the light most favorable to the non-moving party. *Id.*

## III. DISCUSSION

■ A relief or nominal defendant is "a person who holds the subject matter of the litigation in a subordinate or possessory capacity as to which there is no dispute." *SEC v. Colello*, 139 F.3d 674, 676 (9th Cir.1998) (quotation omitted). Typically, a nominal defendant is a trustee, agent, or depositary which the plaintiff joins only to facilitate collection. *Id.* Because the nominal defendant does not have a legitimate claim to the disputed property, he is not a real party in interest. *Id.* Further, because the plaintiff does not assert a claim against the nominal defendant, "it is unnecessary to obtain subject matter jurisdiction over him once jurisdiction of the defendant is established." *Id.* (quotation omitted).

■ Federal courts possess broad equitable powers which "can be employed to recover ill gotten gains for the benefit of the victims of wrongdoing, whether held by the original wrongdoer or by one who has received the proceeds after the wrong." *Id.* (*citing Deckert v. Independence Shares Corp.*, 311 U.S. 282, 287–88, 61 S.Ct. 229, 85 L.Ed. 189 (1940)). This Court therefore has " 'inherent equitable

authority to issue a variety of 'ancillary relief' measures in actions brought by the [Securities Exchange Commission ("SEC")] to enforce the federal securities laws,' " including ordering relief from third parties. *Id.* (*quoting SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir.1980)).

■ The Court has similar inherent authority in actions brought by the CFTC to enforce the CEA. Nothing in the CEA restricts this Court's inherent equitable powers. *CFTC v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 192 n. 4 (4th Cir.2002) (*citing CFTC v. Hunt*, 591 F.2d 1211, 1223 (7th Cir.1979) (noting that although the CEA does not contain the same explicit grant of broad equitable authority found in the Securities Exchange Act, "neither does [the CEA] have any provision restricting the equitable power of the district court")). Further, "[g]iven the general similarity between the role of the [CFTC] and the role of the SEC in remedying wrongs within their respective spheres, it is entirely appropriate to allow the [CFTC] to proceed against nominal defendants under the same circumstances in which the SEC could proceed against such defendants." *Id.* (*citing Colello*, 139 F.3d at 676). The CFTC thus "may name a non-party depository as a nominal defendant to effect full relief in the marshalling of assets that are the fruit of the underlying fraud." *Colello*, 139 F.3d at 677.

■ To obtain relief against a nominal defendant, the CFTC bears the burden of showing the nominal defendant (1) received ill gotten funds and (2) does not have a legitimate claim to those funds. *Id.* Thus, if the relief defendant makes a legitimate claim of ownership, the CFTC cannot recover the subject property without alleging the relief defendant violated the CEA. *SEC v. Ross*, 504 F.3d 1130, 1142 (9th Cir.2007); *Kimberlynn Creek Ranch, Inc.*, 276 F.3d at 192.

Performing services in exchange for compensation is a sufficient claim of ownership to preclude relief defendant treatment. *Ross*, 504 F.3d at 1142 (stating that an employee or vendor who receives compensation in return for services rendered has "presumptive title" to payments); *Kimberlynn Creek Ranch, Inc.*, 276 F.3d at 192 ("We agree that receipt of funds as payment for services rendered to an employer constitutes one type of ownership interest that would preclude proceeding against the holder of the funds as a nominal defendant."). "However, a claimed ownership interest must not only be recognized in law; it must also be valid in fact. Otherwise, individuals and institutions holding funds on behalf of wrongdoers would be able to avoid disgorgement (and keep the funds for themselves) simply by stating a claim of ownership, however specious." *Kimberlynn Creek Ranch, Inc.*, 276 F.3d at 192. A claim of ownership is not legitimate where the relief defendant holds the funds in trust for the primary violator, the ownership claim is a sham, the relief defendant acted as a mere conduit of proceeds from the underlying statutory violation, or some similar specious claim to ownership. *Ross*, 504 F.3d at 1141–42.

Here, there is no dispute that any funds Dubin received from WeCorp were ill gotten. The parties dispute only whether Dubin has a legitimate claim to the funds such that the Court properly may exercise jurisdiction over Dubin as a relief defendant.

CFTC argues Dubin is not entitled to the retainer because he performed no services on WeCorp's behalf. CFTC contends that pursuant to the emails between Dubin and Jones, Dubin was to perform services including reviewing contracts, reworking transactional and organizational documents, placing WeCorp's operations in compliance with state and federal law, obtaining a securities sales license for WeCorp, investigating WeCorp's brokerage contracts, and reviewing WeCorp's banking strategies. CFTC contends Dubin never performed any of these services, and instead immediately began pursuing a business venture with WeCorp. CFTC argues that any work Dubin did was for his own benefit in performing due diligence regarding a joint venture with WeCorp. CFTC notes that Jones demanded a return of the retainer because Dubin had not performed any services on WeCorp's behalf. Dubin responds that this Court has identified over forty documents which are attorney-client protected, and a review of those documents establish that Dubin provided services to WeCorp sufficient to disqualify him as a relief defendant.

Now that the Court has a full evidentiary record, including the unredacted emails between Dubin and Jones, as well as the depositions of Dubin and Bush and the exhibits attached thereto, no genuine issue of material fact remains that Dubin performed work for WeCorp such that he has a legitimate claim to the retainer funds sufficient to preclude his treatment as a relief defendant in this matter. Dubin testified that WeCorp hired him on a flat fee basis and that testimony is supported by the fact that he immediately withdrew the entire retainer amount from his client trust fund account. Under the Hawaii Rules of Professional Conduct, Dubin had a duty to withdraw those funds "when due" and a related duty to keep any retainer in his client's trust account "until earned." Haw. R. Prof. Conduct 1.15(c), (d). Any funds remaining in Dubin's trust account would have made Dubin akin to the paradigmatic relief defendant holding WeCorp's funds in trust for WeCorp, but Dubin held no such funds. Instead, he immediately withdrew the retainer as payment for his services.

As to the work Dubin performed, Dubin testified that he advised WeCorp to shut down its website and return funds to investors to avoid any potential liability for selling securities without a license. Dubin also researched and proposed various restructuring alternatives to WeCorp so that if its claims relating to its forex trading software program were true, WeCorp could function legitimately. Dubin identified structural, compliance, and tax problems associated with WeCorp's business and suggested various alternative proposals either to get WeCorp into compliance, or to phase out WeCorp and create a new business entity. (*See* AC Privilege Docs., November 16, 2008 emails between Dubin and Bush.) For example, Dubin and Jones discussed phasing out WeCorp and having a new business entity work with only one investor. (*See id.*, December 3, 2008 emails between Dubin and Jones.) Dubin also inquired about the ownership of the forex trading software program and advised WeCorp to get a formal purchase or licensing agreement with Lowe and Luis, who purportedly developed and were running the software, so that WeCorp's ownership rights in the software were clarified. (*Id.*, January 8, 2009 emails between Dubin and Jones.)

■ CFTC contends Dubin did not perform any work for WeCorp because all of his advice was aimed at a joint venture between DF and WeCorp. CFTC thus contends Dubin was working on his own behalf, not WeCorp's. However, Dubin provided advice to WeCorp that was of in-

dependent value to WeCorp. Dubin's advice to WeCorp that it shut down its website and return all investor funds to avoid potential securities liability was independently valuable to WeCorp, although ultimately disregarded by Dubin's client. Dubin's advice that WeCorp formalize its ownership or licensing rights in relation to the software also was of independent value to WeCorp to head off any dispute between the corporation and its employees over intellectual property rights. Dubin also proposed various potential operating structures for WeCorp, not all of which involved a merger with DF. While some of this advice may have inured to Dubin's benefit to the extent he envisioned a future joint venture with WeCorp, that he may have had a dual purpose does not negate the fact that Dubin provided services to WeCorp such that he has established a legitimate claim to the funds.

No genuine issue of material fact remains that Dubin performed services presumptively entitling him to the funds. CFTC nevertheless contends Dubin's claim to the funds is not legitimate (A) because he was operating under a conflict of interest and (B) because his services did not provide reasonably equivalent value to WeCorp's creditors.

## A. Conflict of Interest

CFTC argues that Dubin violated Hawaii Rules of Professional Conduct 1.7 [2] and 1.8 [3] by representing WeCorp despite having an adverse interest and by seeking

---

2. Rule 1.7(b) provides that a lawyer "shall not represent a client if the representation of that client may be materially limited ... by the lawyer's own interests, unless: (1) the lawyer reasonably believes the representation will not be adversely affected; and (2) the client consents after consultation."

3. Rule 1.8 prohibits a lawyer from entering into a business transaction with his client

unless the transaction's terms are "fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client." Haw. R. Prof. Conduct 1.8(a)(1). Additionally, the lawyer must give the client a reasonable opportunity to seek the advice of independent counsel and the client must consent in writing. *Id.* 1.8(a)(2)-(3).

a pecuniary interest in WeCorp. CFTC argues that Dubin is not entitled to any fees earned while he was in a conflicted position, and he thus has no legitimate claim to the funds.

For this Court's purposes, it is irrelevant whether Dubin violated any Rules of Professional Conduct because making that determination would amount to adjudicating a dispute between Dubin and WeCorp regarding Dubin's claim to the funds. The question before the Court is not who has a greater right to the funds as between WeCorp and Dubin, but whether Dubin has any legitimate claim to the funds such that relief or nominal treatment no longer is appropriate. Once the Court determines Dubin is not holding funds in trust for WeCorp and that his ownership claim is not a sham, the Court lacks jurisdiction over Dubin because he is not a nominal party holding the primary defendant's property over which there is no dispute as to ownership. A relief defendant may have a legitimate claim of ownership even if he ultimately may lose on the merits of a dispute over ownership adjudicated in a court of competent jurisdiction. To hold otherwise would permit the CFTC to step into a primary violator's shoes and pursue all manner of claims against nominal defendants without ever alleging a violation of the CEA and without establishing any other independent basis for this Court to exercise jurisdiction over those defendants or claims.

Because no genuine issue of material fact remains that Dubin performed services for his fees, he has "presumptive title" to the retainer. Any argument that he should not retain those fees due to an alleged violation of an ethical duty raises a dispute as to ownership which would have to be litigated between WeCorp and Dubin

in an appropriate forum with jurisdiction over that dispute, or CFTC would have to name Dubin as a primary violator of the CEA in this action. CFTC does not have standing through the mechanism of relief defendant treatment to step into WeCorp's shoes and pursue in this Court state law claims WeCorp might[4] have against Dubin.

CFTC relies upon several cases in which courts have ruled an attorney has no right to fees earned while in a conflicted position. However, none of the cases upon which CFTC relies involves a relief defendant or holds that a court can resolve such a dispute while treating the attorney as a relief defendant. All involve an attorney's application for fees before a court which has jurisdiction to adjudicate the attorney's fee dispute. *See Woods v. City Nat'l Bank & Trust Co. of Chicago,* 312 U.S. 262, 263, 268–69, 61 S.Ct. 493, 85 L.Ed. 820 (1941) (adjudicating attorney's claim to compensation under Chandler Act and holding attorney who represented conflicting interests in bankruptcy proceedings was not entitled to all fees regardless of whether fraud or unfairness resulted from conflict; but ordering remand to the district court to evaluate whether some costs and expenses nevertheless should be allowed); *In re Perry,* 194 B.R. 875, 878–81 (E.D.Cal.1996) (denying fees for conflicted attorney in bankruptcy proceeding); *Condren v. Grace,* 783 F.Supp. 178, 179, 185–86 (S.D.N.Y.1992) (adjudicating attorney fee dispute pursuant to diversity jurisdiction and holding attorney was not entitled to fee due to ethical violations); *Swenk v. Asbury,* 62 Pa. D. & C.4th 391 (Pa.C.P. Berks Cnty. 2003) (unpublished) (adjudicating legal fee dispute of attorney intervenor in personal injury action and holding

---

4. The Hawaii Rules of Professional Conduct state that a Rules violation "should not give rise to a cause of action nor should it create

any presumption that a legal duty has been breached." Haw. R. Prof. Conduct, Scope ¶ 6.

attorney was not entitled to equitable relief in quantum meruit where he breached ethical duty by representing clients with conflicting interests). The Court therefore will deny CFTC's motion for summary judgment on this basis.

### B. Reasonably Equivalent Value

CFTC argues Dubin is not entitled to the retainer because he did not provide services in reasonably equivalent value to the $85,000. CFTC contends that where services provided do not add value to the creditors but merely perpetuate a Ponzi scheme, any payment on those services must be returned to be distributed pro rata amongst the defrauded parties.

CFTC relies on *SEC v. Resource Development International, LLC*, 487 F.3d 295 (5th Cir.2007), and describes this case as holding that a "$60,000 retainer payment to an attorney from a Ponzi defendant did not confer 'reasonably equivalent value' to the Ponzi investors and, therefore, had to be returned to the court appointed trustee." (MSJ at 18–19.) However, the Court in that case did not require an attorney to return a retainer payment for failure to provide services of reasonably equivalent value. Rather, as described by the Fifth Circuit:

> After Benjamin Cook's ("Cook") assets were frozen in conjunction with a pending lawsuit by the Securities and Exchange Commission, Anthony Martella ("Martella") agreed with Cook to pay Cook's lawyers $60,000 from his company's corporate account in exchange for immediate reimbursement arranged by Cook. Immediately after completing the payments to Cook's lawyers, Martella's company, M & M Engraving and Manufacturing Co. ("M & M"), received a wire transfer from International Education Research Corporation ("IERC") for the identical amount. IERC was subsequently placed in receivership. The receiver, Warfield, sued Martella and M & M seeking return of the $60,000 payment that M & M had received from IERC on a theory of fraudulent transfer.

*Id.* at 298. Thus, no money was sought from the attorneys who performed the services; rather, the money was sought from the conduit of receivership funds who funneled the money to the attorneys.

Moreover, this case was not in the context of a nominal defendant. Rather, the receiver brought a fraudulent transfer claim against Martella. *Id.* at 299. The Fifth Circuit affirmed the district court's finding that the transfer to Martella was fraudulent because the defrauded creditors of the corporation that made the payment to Martella received no benefit from the funding of the legal defense of the perpetrator of the fraud. *Id.* at 301.

CFTC also relies on *Warfield v. Byron*, 436 F.3d 551 (5th Cir.2006). In that case, the receiver for a Ponzi scheme defendant sued two investors in the scheme for fraudulent transfers because they received more funds from the scheme than they invested. *Id.* at 553–54. One of the investors recruited other investors despite knowing some facts which suggested the investment was a Ponzi scheme, a service for which he was paid. *Id.* at 555. The Fifth Circuit concluded the investor/recruiter did not give reasonably equivalent value for his compensation because "[i]t takes cheek to contend that in exchange for the payments he received, the RDI Ponzi scheme benefitted from his efforts to extend the fraud by securing new investments." *Id.* at 560; *see also In re Ramirez Rodriguez*, 209 B.R. 424, 434 (Bankr.S.D.Tex.1997) (holding that participant in Ponzi scheme provided no reasonably equivalent value to support commissions based on getting others to invest in the Ponzi scheme and commissions therefore were fraudulent transfers).

Like *Resource Development, Warfield* and *Ramirez Rodriguez* are not nominal defendant cases. Even if the reasoning of those cases were applicable, Dubin does not seek to be compensated for recruiting new investors to be duped into the Ponzi scheme. Further, Dubin provided services to WeCorp that did not necessarily prolong the Ponzi scheme. Dubin testified that he told Jones to shut down WeCorp's website and return investors' funds to avoid securities liability. Dubin also suggested various means for WeCorp to operate in compliance with securities laws. That WeCorp did not take his advice does not mean that Dubin's services to WeCorp did nothing more than prolong the Ponzi scheme. Additionally, the only evidence that anyone invested money in WeCorp once Dubin began providing services to WeCorp was that Dubin invested $200,000, which was not invested as a result of Dubin's provision of legal services to WeCorp. Dubin therefore is not seeking compensation for legal services that did nothing more than prolong the Ponzi scheme.

Moreover, courts have not treated relief defendants in the manner CFTC proposes, even where the relief defendants had an arguably integral role in continuing the Ponzi scheme. For example, in *Ross,* the nominal defendants were salesmen of the unregistered securities that fueled the Ponzi scheme, yet the Ninth Circuit concluded the salesmen presumptively had title to their commissions like any other vendor or employee providing services to the corporation such that nominal defendant treatment was inappropriate. 504 F.3d at 1142. Likewise, in *Kimberlynn Creek Ranch, Inc.,* the nominal defendant's claim that he was compensated for services rendered was rejected because the district court found him lacking in credibility, not because his services necessarily prolonged the illegal activity and thus conferred no reasonably equivalent value. 276 F.3d at 192.

CFTC's position is untenable in the relief defendant context. If CFTC's view were correct, any employee or service provider, no matter how remote from the fraudulent activity, potentially could be a relief defendant forced to disgorge compensation for services rendered because their services prolonged the scheme and thus provided no reasonably equivalent value. That would expand the concept of relief or nominal defendants, and the Court's jurisdiction over those nominal parties, beyond what, so far, has been contemplated by the doctrine. It also is contrary to the underlying premise of the doctrine, which is that no jurisdiction over the nominal defendant is necessary because he is merely a holder of the primary defendant's property as to which there is no dispute. If the Court went beyond merely ensuring a non-specious claim to the funds, the Court would expand its jurisdiction over a party and a dispute it normally would not have the power to adjudicate. The Court therefore will deny CFTC's Motion on this basis.

Because no genuine issue of fact remains that Dubin has a legitimate claim to the entire retainer as a flat fee for services rendered, he no longer is akin to a traditional nominal defendant who holds the primary defendant's property in trust with no dispute as to ownership of those funds. The Court therefore will grant Dubin's Countermotion and dismiss Dubin as a relief defendant in this action.

## IV. CONCLUSION

IT IS THEREFORE ORDERED that Plaintiff Commodity Futures Trading Commission's Motion for Summary Judgment (Doc. # 248) is hereby DENIED.

IT IS FURTHER ORDERED that Relief Defendant Gary Dubin's Countermotion for Summary Judgment (Doc. # 261) is hereby GRANTED.

IT IS FURTHER ORDERED that this action is hereby dismissed as to Relief Defendant Gary Dubin for lack of jurisdiction.